UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK          FOR ONLINE PUBLICATION ONLY
----------------------------------------------------------------- X
ANTHONY E. MOSELY,                           :
                                             :
                    Plaintiff,               :
                                             :              MEMORANDUM
         - against -                         :              AND ORDER
                                             :
ISLAND COMPUTER PRODUCTS, INC.,              :              04 CV 2469 (JG)
                                             :
                    Defendant.               :
----------------------------------------------------------------- X

A P P E A R A N C E S :

    SERVINO & SANTANGELO LLP
        151 Broadway
        Hawthorne, New York 10532
    By:    Anthony J. Servino
        Attorneys for the Plaintiff

    REED SMITH LLP
        599 Lexington Avenue
        New York, NY 10022
    By:    Gregory B. Reilly
        George M. Patterson
        Robert H. Bernstein
        Attorneys for the Defendant

JOHN GLEESON, United States District Judge:

        Anthony Mosely, a former salesperson for the defendant, Island Computer Products, Inc. ("ICP"), filed this diversity action seeking payment of sales commissions he alleges he is owed for two projects ICP performed for the New York State Board of Education ("BOE"). The complaint states two causes of action: (1) breach of contract; and (2) violation of Article 6 of the New York State Labor Law. The parties agree, however, that if Mosely's claim for breach of contract fails, then so does his claim under the Labor Law.

        ICP moves for summary judgment on the ground that Mosely was an employee at

will, and therefore ICP was entitled unilaterally to alter the terms and conditions of his employment, including the rate of his commissions. Mosely concedes he was an at will employee, but counters that New York law permitted ICP to alter his commission structure only prospectively. The commissions he seeks, Mosely argues, were already earned at the time ICP sought to reduce them because he had "an express agreement with [ICP] whereby he would receive a 30% commission on all the services he sold to the [BOE] for the duration of each of those contracts." Pl. Mem. at 1. As set forth below, even taking Mosely's version of the disputed facts as true, he has not adduced sufficient evidence to support his theory. I therefore grant ICP's motion for summary judgment.

BACKGROUND

Mosely worked for ICP as a salesperson, under the title of Senior Client Executive, from 1993 until April 9, 2004. Mosely was responsible for selling both computer hardware and consulting services, as well as for maintaining relationships with the clients to whom he sold that business. In return he was paid a bi-weekly base salary, as well as a monthly commission that was, for all relevant purposes here, calculated as a percentage of ICP's "gross profit" on his sales (the term "gross" indicating that in arriving at the figure, all of ICP's costs were subtracted from its revenue on a given sale except commission). Initially, the same commission structure applied to all of Mosely's accounts. That arrangement, however, was not reduced to a writing.

During the mid-1990s, ICP applied for and obtained the qualification as an approved vendor for the New York State Office of General Services, and shortly thereafter it responded to two requests for proposals ("RFPs") from the Board of Education. ICP won the

two projects, which were called "TBANK" and "Galaxy 2000." With respect to the TBANK project, the parties agree Mosely was assigned to service the account when the project began in late 1998, and he was paid a commission of 30% of ICP's gross profit arising therefrom until the Spring of 2000. Mosely was assigned to service the Galaxy 2000 project when it began in 1999, and he continued to do so through April 2004, when he ended his employment with ICP. He was initially paid the same 30% commission rate for the Galaxy 2000 project as with the TBANK project.

ICP billed the BOE monthly on both contracts, as the products and services needed to carry out the projects fluctuated regularly. Pl. Ex. G at 1-2, 11. Mosely's commission was likewise calculated monthly, and it depended on the particular revenues and costs that were associated with each project as they progressed. With respect to the Galaxy 2000 project, ICP and the BOE negotiated a new memorandum of understanding each year as the project evolved.

In the Spring of 2000, ICP's management notified Mosely that it was cutting his commission on the BOE projects to less than half of their previous levels. Mosely objected strenuously and continually to the reduction until finally, in April of 2004, he quit the job.

DISCUSSION

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law governing the case identifies the facts that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will

3

properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.*

Moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted); *see also, e.g.*, *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000) ("[W]e ... view [the facts] in the light most favorable to, and draw inferences in favor of, the non-moving party ...." (internal quotation marks omitted)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586-87 (quoting Fed. R. Civ. P. 56(e)).

The parties agree that Mosely was, throughout his time at ICP, an employee at will, and therefore ICP was "entitled to change the terms of [his] employment ... prospectively, subject to [his] right to leave the employment if the new terms were unacceptable." *Gebhardt v. Time Warner Entm't*, 726 N.Y.S.2d 534 (4th Dep't 2001); *see also Bottini v. Lewis & Judge Co.*, 621 N.Y.S.2d 753 (3d Dep't 1995) (same). The issue that divides them is whether, when ICP unilaterally reduced Mosely's commission rate on the BOE projects in the Spring of 2000, Mosely had already "earned" the commissions associated with those projects up through April 2004 by virtue of his having "booked" the business and negotiated "an express agreement with [ICP] whereby he would receive a 30% commission on all the services he sold to the [BOE] for

4

the duration of each of those contracts." Pl. Mem. at 1.[1]

On that score, Mosely relies principally upon *Gebhardt v. Time Warner Entertainment*, 726 N.Y.S.2d 534 (4th Dep't 2001), in which the plaintiff sought to recover commissions on the sale of advertising time on cable television. As the court explained:

> According to ... the parties' sales commissions agreement, there were only two instances in which a vested commission could be denied: if a client failed to pay, or if an advertisement was aired after the termination of a sales representative's employment. Neither exception is applicable to the 1995 Fucillo account. When the deal was "booked," the commission rate was established at 13%, and the defendant was not entitled thereafter to lower the rate after the 1995 deal was closed.

*Id*. The court in *Gebhardt* was thus not deciding the question at issue here -- when, under the terms of a commission agreement, does a commission become vested? -- but was rather taking it as fact that the commissions at issue were already "vested" when the employer sought to change the rate. The court did not explain how it arrived at this fact; it did not say whether that issue was contested; and it did not quote the terms of the agreement leading it to that finding. *Gebhardt* therefore provides a recitation of the operative legal standard, but gives little guidance as to how it should be applied in this case.

As ICP argues, there is no evidence that Mosely secured an agreement providing that his commissions for the duration of these two multi-year service projects were deemed "earned" at the very beginning. Indeed, the plaintiff's deposition testimony is to the contrary:

---

[1] The defendants dispute that Mosely actually "booked" the TBANK and Galaxy 2000 projects. For example, with respect to the TBANK project, Mosely admits that "he was not involved in responding to the [RFP]," but he claims to have "closed the deal and won the contract for ICP after extensive negotiations with David Wolovick, Director of Business Systems Development for the BOE." Pl. Mem. at 3. The defendants point out, however, that Mosely was asked at his deposition: "And after ICP won the TBANK project, that was the first time you met Mr. Wolovick?" He answered, "Yes." Pl. Tr. 77. For purposes of ICP's motion for summary judgment, of course, this dispute must be resolved in Mosely's favor.

5

> Q: [I]s it your understanding that once you're assigned the account rep for Galaxy, the project is let's say six months or a year into the contract, that ICP cannot change your commission rate?
>
> A: If they change my commission rate on this project, they might as well change it on ... all the other projects that I had because this was part of the commission rate at the time. Then they should have changed it on everything else and everybody else.
>
> Q: Did you have an understanding of whether ICP could change your commission rate after you've begun working as a sales rep for the project?
>
> A: No.
>
> Q: You didn't have an understanding one way or another?
>
> A: No, it's based on the commission plan itself, the actual commission plan in place. That's ... what I got paid on that year. This was just a new project within the same commission plan. It's the same thing. This went on for 18 months I was getting paid for this project at this same commission rate and then one day out of the blue in 2000 someone says I'm not paying you that now.

Pl. Tr. 120-21. When Mosely finally decided to leave ICP, he sent a lengthy e-mail of grievances to ICP management in which he stated that he viewed the reduction in his commission rate on the BOE projects "as an act of 'financial discrimination.'" Def. Ex. C. He made no mention, however, of any understanding that his commissions were already "earned" at the outset of the BOE projects and that ICP therefore had no right to reduce the rates retroactively.[2]

In determining whether a sales commission has been "earned" or has "vested,"

---

[2] In his deposition, Mosely also stated that when ICP management decided to reduce his commissions in 2000, he was first told that the BOE projects would not be affected, but that ICP thereafter "turned around and applied that new commission structure to [the BOE projects]." Pl. Tr. 145. The fact that a particular proposed modification in Mosely's terms of employment did not affect the BOE projects, however, does not amount to an agreement that the commission rates for the BOE projects were unchangeable. In any event, even if ICP management had promised Mosely that the commission rates on the BOE projects would not be reduced (in order to entice Mosely to continue working there), such a promise would not supply what Mosely needs here: a specific agreement that his commissions on the BOE projects were deemed earned and vested at the time ICP was awarded the projects.

absent an explicit understanding to the contrary, the New York courts have been highly skeptical of plaintiffs' claims "to prospective commissions for the indefinite future simply because [the plaintiff] allegedly originated defendant's relationship with [the] client." *Yudell v. Ann Israel & Assoc.*, 669 N.Y.S.2d 580 (1st Dep't 1998). This is so because sales commissions are paid, in the ordinary course, "not merely because [the salesman] secured the[] original contracts, but because he was there to aid, if necessary, in securing renewals or additional contracts, and in keeping his customers in touch with the defendant." *Scott v. Engineering News Publ. Co.*, 47 A.D. 558, 559 (1900). Indeed, as Mosely testified in his deposition, he was "constantly selling" on the BOE projects; "It's not like I just sit there ...." Pl. Tr. at 150-51; see also, *id*. ("Q: Isn't it the case that once Galaxy and the TBANK account are in place, the contracts signed, that your role as the sales representative[,] you don't have to sell more business to this account, correct? A: No, not true .... [A]ny opportunity that came up for them -- for us to sell something, I was there to get that done.").

Moreover, Mosely's commissions were not discrete sums dictated by the terms of the contracts he "closed" with the BOE. *See, e.g.*, *Simas v. Merrill Corp.*, 2004 WL 213013 (S.D.N.Y.).[3] Rather, his initial commissions, 30% of ICP's gross profit, were calculated for the

---

[3] Judge Duffy in *Simas* noted that construing a sales commission to be fully earned at the beginning of a multi-year contractual relationship could lead to absurd results. Although he did not elaborate on that point, supporting examples are easy to conceive. Suppose Mosely, as he alleges, was responsible for closing the two BOE deals initially, but thereafter during the course of performance he became unsatisfactory to the BOE. ICP would naturally wish to transfer the account to another sales representative. Under Mosely's theory of when his commissions were earned, ICP would still be required to pay him full commission throughout the duration of the project. For another example, suppose a company divided up its sales assignments by geographic territory, as many companies do, and that it became necessary to shift salespeople from one territory to another during the course of long-term client relationships. The company would be bound under Mosely's theory to continue paying commissions to the salesperson who originated each account, regardless of the territory they were assigned to service. Of course, such a rule could be bargained for by explicit agreement, but the law does not establish it as the default rule in contexts like this one.

BOE projects on a monthly basis, and they necessarily reflected the revenue ICP received from its monthly invoice to the BOE. They varied according to how the demands of the project evolved, how many hours of consulting time Mosely sold (and ICP's margins with respect to specific hourly billable rates), how much hardware he sold, and so on. Thus, at the outset of these multi-year contractual relationships, Mosely had neither fully upheld his end of the bargain (that he be "constantly selling" over the life of the contract), nor were the amounts of the claimed commissions even remotely calculable, much less payable. In sum, Mosely's claim here is to commissions on "future sales," as even his own memorandum characterizes them, Pl. Mem. at 1, rather than to already earned commissions. As to future sales, ICP was perfectly within its rights under New York law to change the terms of Mosely's at-will employment. *See Hanlon v. McFadden Publ'n*, 302 N.Y. 502, 505 (1951) (with respect to an employee at will, "employer at all times [has] the right to fix his compensation, to reduce it or to change it, without assigning any reason therefor").

* * *

Formally, at least, Mosely has cross-moved for summary judgment on ICP's counterclaims. He has not made any legal argument upon that cross-motion, however, except to say that "there is not one shred of evidence to support these baseless allegations." Pl. Mem. at 11. This kind of cursory treatment does not provide the court with a sufficient basis upon which to grant Mosely's cross-motion. However, in response to a question posed at oral argument, ICP has since informed the Court that it will voluntarily discontinue the counterclaims if it prevails on its motion.

CONCLUSION

Accordingly, for the reasons set forth above, ICP's motion for summary judgment is granted. ICP's counterclaims are dismissed on its own motion. The Clerk is directed to close the case.

So ordered.

Dated:	Brooklyn, New York
	February 9, 2006